Filed 3/9/15  In re J.D. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re: J.D., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEATH AND HUMAN SERVICES AGENCY, | D066525 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14737A) |
| v. | |
| L.O., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Emily K. Harlan, Deputy County Counsel for Plaintiff and Respondent.

L.O. (mother) appeals from an order terminating parental rights to her child J.D. and choosing adoption as the appropriate permanent plan under Welfare and Institutions Code[1] section 366.26. Asserting she maintained "consistent contact" with J.D. for the majority of the dependency and that J.D. would have benefitted from continuing their relationship, mother contends there is no substantial evidence supporting the juvenile court's ruling in which it declined to apply the beneficial-relationship exception to adoption preference. (§ 366.26, subd. (c)(1)(B)(i).) We reject this contention, and conclude substantial evidence supports the juvenile court's determination that the beneficial relationship exception did not apply. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

*Agency's Section 300 Petition*

In November 2012, the San Diego County Health and Human Services Agency (Agency) filed a section 300 petition on behalf of then eight-month-old J.D, alleging under section 300, subdivision (b) that mother had been using amphetamine or methamphetamine to excess, and had admitted using drugs during her pregnancy and as late as October 20, 2012, in her home with J.D. present. A referral from the child abuse hotline had reported that mother appeared to be under the influence as she was rambling and not making sense, and she appeared to weigh 75 pounds. The reporter was concerned mother was driving with the child while under the influence. Agency alleged mother's drug use rendered her unable to provide regular care for J.D., who was in need

_____

[1]    Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

of juvenile court protection. Agency subsequently recommended J.D. be detained outside of the home and the parents be offered liberal supervised visits.[2]

Mother visited J.D. at the courthouse on November 5, 2012, but the foster mother observed she was not very interactive; mother took several cigarette breaks and spent most of the time with her boyfriend rather than J.D., leaving J.D. with family members. Other visits on November 11, 2012, and November 13, 2012, went well; mother was attentive, affectionate and interactive with J.D., reading and talking with her. Mother cancelled a visit later that month and rescheduled it for the next day. In late November 2012, mother told the social worker she was leaving San Diego to live with her father in Los Osos, California.

In early December 2012, mother entered the KIVA residential treatment program. Mother's drug test was negative upon her entry. During a visit with J.D. that month, mother was instructed to feed J.D. oatmeal and fruit, but instead fed her cookies and cereal. Mother otherwise sat or laid on the floor with J.D., spoke continuously with her, played with and held her, changed her wet diaper, and read a Dr. Suess book to her. Mother stayed close and ensured J.D. did not get hurt, and also did not permit J.D. to eat cereal that had fallen on the floor.

Mother was released from KIVA toward the end of December 2012 after returning late from a pass. The program agreed to accept her back in January 2013, and mother's

---

[2]     J.D.'s alleged father, D.D. who never appeared for a paternity test, does not appeal from the court's order. His attorney was relieved at the six-month review hearing after she was unable to maintain contact with him. Agency's other efforts to locate D.D. were unsuccessful.

January 1, 2013 drug test was positive for methamphetamine, amphetamine, and marijuana. Mother attended a session with a therapist who noted that mother reported drug and alcohol addiction that had plagued her for several years, that her preferred drug was crystal methamphetamine, and that she had relapsed in December 2012 after about one year of sobriety. Mother's report to the therapist contradicted her earlier admission to the child protective services worker that she had used methamphetamine as late as October 20, 2012.

In late January 2013, the trial court made a true finding on Agency's section 300 petition and set the matter for a contested disposition hearing. The contested disposition hearing was later continued to March 20, 2013.

*Disposition Hearing*

As of early March 2013, mother was doing well in KIVA and had clean drug tests. She was attending weekly therapy sessions and was cooperative, compliant and insightful, as she recognized she would need structure after completing her drug treatment program. During visits supervised by Agency, one in late January 2013, two in February 2013, and one in early March 2013, mother was attentive and engaged J.D., was playing with and reading to J.D., and J.D. appeared comfortable with her. J.D.'s counsel authorized Mother to have short unsupervised visits with J.D. on KIVA's grounds. The social worker was authorized to place J.D. with her maternal grandmother, M.S.

At the March 20, 2013 disposition hearing, the court, following Agency's recommendation, removed J.D. from mother under section 361, subdivision (c)(1) and ordered she be placed with M.S. It ordered that mother have unsupervised visits with

4

J.D. on KIVA's grounds, and gave the social worker discretion to expand the visits off-grounds and to overnights.  The court also gave the social worker discretion to permit mother a 60-day extended trial visit with J.D.'s counsel's approval.

*Reunification Efforts and Relapse*

Mother's case plan required her to attend therapy to address the effect her own mother's substance abuse had on her childhood,[3] and participate in inpatient drug treatment, random drug testing, and an in-home parenting program.  She was expected to attend J.D.'s medical and developmental appointments and attend all of her scheduled visits on time, clean and sober.  Mother's six-month review hearing was scheduled for September 2013.

Mother graduated from KIVA in May 2013 and enrolled in aftercare at McAlister Institute two days a week.  She successfully completed her therapy in June 2013.  That month, Agency gave mother permission to travel with J.D. to Los Osos to visit mother's father.  On May 22, 2013, mother began a 60-day trial visit with J.D.

In July 2013, Agency recommended the 60-day visit be terminated and J.D. returned to M.S. due to mother's relapse.  The social worker reported that on July 1, M.S. removed J.D. from mother's care after receiving a call from her boyfriend's mother informing M.S. that mother was acting differently and not caring for J.D. as usual.  Mother was asked to drug test on July 5, but was unable to provide a sample, constituting

---

3       M.S. had 10 years of recovery from substance abuse and lived with her husband, who had 15 years of recovery.  M.S. worked at a university as a student advocate and was a full-time student working toward an associate degree in general education.  Her husband was a program manager at the McAlister Institute's teen recovery center.

a positive test. A few days later, mother admitted to the social worker that on July 5, she drank alcohol because she was "stressed out," which led to her smoking marijuana and using methamphetamine with an acquaintance.

*Six-Month Review*

In early September 2013, Agency filed a status report for the six-month review hearing. Mother had not kept in consistent contact with M.S., J.D. or the social worker since her relapse; she was not currently participating in any drug treatment, and on August 23, 2013, she admitted she was still actively using drugs. Though mother had initiated in-home parenting classes in mid-June and went to two appointments, she cancelled her next meeting, became uncommunicative, and was discharged from the program in August 2013. After mother's relapse, her counselor at McAlister Institute permitted her to continue, but required her to attend four days a week. Mother had five absences and three failures to test in August 2013. Since relapsing in early July 2013, she had seen J.D. only a few times; attending one of J.D.'s doctor's appointments on July 22, and visiting her again on July 29, during which she cleaned J.D.'s room, gave her a bath, and clipped her nails. Mother had three supervised visits in August 2013.

J.D. was a normal, well-functioning one-year old who was able to walk and crawl onto the couch and say some words. She was very comfortable in M.S.'s presence, and M.S. and J.D. were very bonded to each other, with J.D. going to M.S. for food, drink and affection when tired. M.S. expressed on multiple occasions her desire to adopt J.D.

Despite mother's difficulties, Agency recommended she be given another six months of services. The social worker believed mother had too quickly overwhelmed

6

herself after leaving KIVA and mother felt she lacked support, causing her to relapse. The social worker stated that mother was very able to physically and emotionally care for J.D., and if she were to reestablish her sobriety and involve herself in J.D.'s life by visiting consistently, she would be able to reunify successfully, as she had previously shown an ability to remain sober and engage in services. Agency recommended mother have supervised visits and possibly unsupervised overnights at the social worker's discretion.

In October 2013, the court granted mother's continuance request and set the six-month review hearing for November 15, 2013. It left a 12-month review hearing in place for January 2014.

In October and November 2013 addendum reports, Agency recommended that mother's services be terminated and that the court set a section 366.26 hearing to establish a permanent plan. Mother reported she had resumed outpatient treatment at the McAlister Institute on September 30, 2013, but was hoping to get into another program called Family Recovery Center. In early October, mother told the social worker she missed a visit with J.D. because " 'something happened to her over the weekend.' " She declined to further explain what had happened. Two days later, mother decided she did not want to go to McAlister because an "incident" had happened, but she was clean since she had attempted to get high on October 8, 2013. Mother failed to drug test on October 21, 2013. She had a brief visit with J.D. on October 27, 2013. Two days later mother came to McAlister but left the same day. She refused to drug test, claiming she was high. McAlister discharged mother at the end of October 2013.

7

In early November 2013 Mother was admitted to the CRASH (Community Resources and Self-Help) program, but again left the next day. She admitted to the social worker that her tendency was to run from her situations, then get on her feet and do well, and then " 'sooner or later end up falling harder than the time before.' " Mother then started outpatient services at a center in San Jacinto. The social worker reported that mother's commitment level was "very low" and her behavior showed she was unable to commit to reunification with J.D., who needed stability and consistency. According to the social worker, mother had not made significant changes necessary to safely parent her child.

Mother did not appear for her contested six-month review hearing or the continued November 2013 hearing. The court considered the September, October and November 2013 Agency reports and found J.D.'s return to mother would create a substantial risk of detriment to J.D.'s physical and emotional well-being, that mother had not made substantive progress with her case plan, and there was not a substantial probability J.D. would be returned to mother within the next six months. It set a section 366.26 hearing for March 2014.

*Section 366.26 Hearing*

In a February 2014 section 366.26 report, Agency recommended parental rights be terminated and the court set a permanent plan of adoption for J.D. Social worker Alvin Soto reported that J.D. was a healthy one-year old who had possible neurofibromatosis that was being closely monitored by M.S. and doctors. According to M.S., J.D. was attending daycare and learning colors and shapes, counting, and expanding her

8

vocabulary. M.S. reported that J.D. called her "mommy" and called mother "mom." M.S. believed mother was homeless.

Social worker Soto reported that mother's contact with J.D. was "sporadic and inconsistent," and when they did occur, the visits were supervised. Mother had a three-hour visit with J.D. on December 24, 2013, at an El Cajon mall. According to M.S., mother played, hugged and kissed J.D., but J.D. saw her as a friend and came to M.S. to get her needs met and showed comfort when returned to M.S.'s care without crying. M.S. reported that mother visited J.D. on January 18, 2014, at a fast food restaurant. Though J.D. knew mother and was very excited and affectionate when she saw her, J.D. became fussy and mother needed assistance in getting J.D. into her car seat. Once M.S. assisted, J.D. was able to calmly enter her seat. M.S. gave mother Soto's business card and asked her to call him, but mother did not say she would do so. M.S. also reported that mother was pregnant and was missing prenatal care appointments, and mother did not want to discuss her pregnancy. M.S. believed mother was still using drugs given her appearance and failure to remain in contact, though she did not believe mother was under the influence during the visit.

Social worker Soto visited M.S. and J.D. at their home in late January 2014, and saw J.D. could hold her own cup and follow two-step commands. J.D.'s room was well furnished and had plenty of age-appropriate clothing and toys. Mother was avoiding any contact with him.

Soto eventually received a telephone call from mother on February 2, 2014, who told him she had not seen J.D. in three weeks because she was busy and pregnant, and

9

needed to take care of herself. Though mother said she had a prenatal appointment, she was unable to give an exact date, name, address or contact person for the clinic. Mother admitted she was unable to provide for J.D.'s needs, though she loved her and wanted to be a part of her life. She remarked that her own mother " 'expects me to be there all the time and I can't at this time.' " Mother knew J.D. was in "good hands" and that M.S. would provide J.D. with everything she needed. Mother reported that she had been using methamphetamine daily before she got pregnant. She initially denied currently using drugs, but then admitted she had last smoked methamphetamine three days before she last saw J.D. Mother agreed to enter a treatment program for her newborn's well-being. After mother claimed she did not know when she could visit J.D. because she did not know M.S.'s work schedule, social worker Soto scheduled a visit with mother and J.D. On the day scheduled for that visit—February 7, 2014—mother cancelled, telling him "something came up." Mother's speech was rapid and difficult to understand.

Soto reported that J.D. considered M.S. as her own mother, looking to her for safety and nurturing, and he observed J.D. to have a strong attachment to M.S. M.S. provided J.D. with her daily basic medical, educational, developmental and emotional needs, followed up with her medical appointments and doctors' recommendations, and took the initiative to teach J.D. basic age-appropriate academic foundations. M.S. was committed to the long term plan of adopting J.D. Soto reported that in the event M.S. was not able to adopt J.D., there were 19 possible adoption families approved to adopt a child matching J.D.'s characteristics. He reported that the alleged father, D.D., had not contacted him or Agency, he had not made any attempts to visit J.D. or inquire about her

10

well-being, and his whereabouts were unknown. Soto recommended that the court terminate parental rights and order a permanent plan of adoption for J.D., as no exceptions to adoption applied and adoption was in J.D.'s best interest.

In an August 2014 addendum, Soto reported in part that in mid-July, M.S. informed him that mother and her boyfriend had moved to mother's paternal grandmother's trailer located on a dirt road outside of Hemet. M.S. believed it was not a secure place for an infant. M.S. reported that mother had had some contact with J.D. in the past several months: two telephone calls and one late visit (but one no show) in March 2014; two one-hour visits, two visits with time unspecified, and two telephone calls (but two cancellations and one no-show) in April 2014; two three-hour visits, one 50-minute visit, and one two-hour visit in May 2014; and one three-hour visit in June 2014. Mother had a four-hour visit with J.D. on July 13, 2014, and a 15-minute visit on July 23, 2014. On August 1, 2014, mother had a 30-minute visit with J.D. and her sister, but mother cancelled another visit scheduled the next day (Saturday), asking that it be rescheduled to Sunday. That Sunday, M.S. arrived at the meeting place but left after receiving a call from mother, who told M.S. she had not left her house because she was sad and crying. Soto reported that as of early August 2014, mother had not begun drug treatment and was not engaged in any Narcotics Anonymous or Alcoholics Anonymous meetings. He stated that due to mother's poor choices surrounding drug use and inability to protect her children or act in the best interest of their safety, Agency continued to recommend a permanent plan of adoption for J.D.

11

At the section 366.26 hearing, the trial court received into evidence social worker Soto's section 366.26 assessment report, an April 2014 addendum, and the above-referenced portions of the August 2014 addendum report. It also received a handwritten letter from mother filed August 6, 2014, in which she stated she was in residential treatment and had clean drug tests since July 2, 2014, but also admitted that due to her drug use she had not been able to see J.D. on a consistent basis if at all. Mother asked to be placed in voluntary drug court. The court found by clear and convincing evidence none of the circumstances listed in section 366.26, subdivision (c)(1)(B) existed, J.D. was likely to be adopted if parental rights were terminated, and that adoption was in J.D.'s best interest. It terminated all parental rights and found M.S. and her husband to be the prospective adoptive parents.

Mother appeals from the order terminating her parental rights.

DISCUSSION

I. *Legal Principles*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include adoption. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296; *In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) "If the dependent child is adoptable, there is strong preference for adoption over the alternative permanency plans." (*In re S.B.*, at p. 297; *In re Michael G.* (2012) 203 Cal.App.4th 580, 588.) Under section 366.26, if parents have failed to reunify with a child, and the juvenile court determines by clear and convincing evidence that it is likely the child will

12

be adopted, the court "shall terminate parental rights and order the child placed for adoption."  (§ 366.26, subd. (c)(1).)

In order to avoid termination of parental rights and adoption, a parent must show that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply.  (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)  The exceptions permit the court, "in *exceptional circumstances*," "to choose an option other than the norm, which remains adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53; see also *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 ["Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."].)  The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances:  [¶]  . . . The parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i), italics added.)  This court construes the "benefit" necessary to trigger this exception to mean that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the

13

child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; see also *In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

The parent asserting the exception has the burden of proving it by a preponderance of the evidence. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.) The parent will not meet his or her burden by showing the existence of a "friendly and loving relationship," an emotional bond with the parent, or pleasant, even frequent, visits. (*Ibid.*; *In re C.F.*, *supra*, 193 Cal.App.4th at p. 555; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re L.S., Jr.* (2014) 230 Cal.App.4th 1183, 1200 ["To avoid termination of parental rights, it is not enough to show that a parent-child bond exists."].) There must be a parental role in the child's life, resulting in a significant, positive emotional attachment from the child to parent that if severed would result in harm to the child. (*In re C.F.*, at p. 555; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; see also *In re J.C.*, at p. 529 [observing that interaction between a natural parent and child will always confer some incidental benefit to the child and for the exception to apply, " 'a *parental* relationship is necessary[.]' "].)

## II. *Standard of Review*

The parties dispute the proper standard of review of the juvenile court's ruling rejecting the beneficial relationship exception to adoption. Mother argues our role is only to view the record for substantial evidence to support the court's findings; that we should decline to apply the dual standard used in *In re J.C.*, *supra*, 226 Cal.App.4th 503 and *In*

14

*re Bailey J.* (2010) 189 Cal.App.4th 1308, in which the court reviews for substantial evidence the factual issue of the existence of a beneficial parental relationship, and applies the abuse of discretion standard to the determination of whether there is a compelling reason for finding that the child would suffer detriment by termination of parental rights. (*J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531; *Bailey J.*, at pp. 1314-1315; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) Mother maintains the dual standard essentially requires a parent to prove a third element—a compelling reason to find termination would be detrimental—beyond regular visitation and a beneficial relationship, and is an incorrect interpretation of section 366.26, subdivision (c)(1)(B)(i). According to mother, evidence satisfying both prongs of the exception will necessarily constitute evidence of a compelling reason not to terminate parental rights.

We need not decide the question because even if we were to limit our review to a search for substantial evidence supporting the court's order, we would affirm. Under that standard, our power " 'begins and ends with a determination as to whether or not there is any substantial evidence, *whether or not contradicted*, which will support the conclusion of the' " juvenile court. (*In re David H.* (2008) 165 Cal.App.4th 1626, 1633, italics added; see *In re Heather A.* (1996) 52 Cal.App.4th 183, 193; *In re Tania S.* (1992) 5 Cal.App.4th 728, 733.) We view the record in the light most favorable to the court's order, and draw all reasonable inferences from the evidence to support the findings and conclusions. (*Tania S.*, at p. 733.) We defer to the juvenile court's determinations as to the credibility and weight of the evidence. (See *ibid*.)

15

As we will explain, mother failed to meet her burden of producing evidence she maintained regular visitation or that J.D. would benefit from continuing her relationship with mother. As a result, mother cannot show her relationship with J.D. promoted J.D.'s well-being to such an extent that it outweighed the well-being she would gain in a permanent home with adoptive parents. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166; *In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

III. *Mother Did Not Meet Her Burden to Establish the Beneficial Relationship Exception*

A. *Mother Has Not Shown She Maintained Regular Visitation and Contact with J.D.*

The juvenile court in this case did not make a specific finding as to the consistency or regularity of mother's visitation. However, the reviewing court may imply a finding of the juvenile court if substantial evidence supports it. (*Jose O. v. Superior Court* (2008) 169 Cal.App.4th 703, 708.) Here, though mother had initially made progress in drug treatment and was visiting J.D. regularly in early 2013 leading to an extended 60-day visit in May 2013, mother then relapsed in early July 2013 and her visitation with J.D. suffered greatly. After that point, mother's contact with J.D. was accurately characterized by social worker Soto as inconsistent and sporadic. As we have summarized more fully above, as of mid-September 2013, mother had had only four supervised visits with J.D.: one in July 2013 and three in August 2013. She had a brief visit in late October 2013 and did not see J.D. again until in late December 2013. Mother later admitted that during this time she had last used methamphetamine only days before her December 2013 visit with J.D. From January to February 2014, mother saw J.D. only once and cancelled the one visit in February scheduled by social worker Soto because she was "busy" the day before

16

and "something came up." She proffered excuses as to why she had not visited J.D. for three weeks, telling Soto she was pregnant and needed to take care of herself. In the six-month period from March 2014 through August 2014, mother had only 12 visits with J.D., she did not show up for two visits in March and April, cancelled two visits in April, and had only one visit in June. In July, mother saw J.D. for four hours when M.S. drove J.D. out to mother's paternal grandmother's house outside San Diego. She saw her again later that month for 15 minutes when M.S. picked up mother's newborn baby's bag. Mother had a half-hour visit on August 1, but cancelled the visit scheduled the next day.

It is evident that mother's long-standing difficulties with drug use hampered her ability to engage in regular visitation with J.D. She simply did not engage in significant or consistent visitation and contact over the last year of J.D.'s life leading up to the section 366.26 hearing. Substantial evidence thus supports the juvenile court's implied finding that mother had not "maintained regular visitation and contact with" J.D. (§ 366.26, subd. (c)(1)(B)(i)) and, therefore, she did not meet her burden to satisfy the first prong of the beneficial parent-child relationship exception to termination of parental rights. (*Ibid*.; see *In re C.F.*, *supra*, 193 Cal.App.4th at p. 554 ["Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption."].) Mother's failure to meet the first prong of the beneficial relationship exception is enough by itself to affirm the court's order.

B. *Mother Has Not Presented Evidence That J.D. Would Benefit From Continuing Their Relationship*

Even if mother had maintained regular visitation, substantial evidence supports the juvenile court's implied finding that the second prong of the beneficial parent-child relationship exception was unmet. (See *In re C.F.*, *supra*, 193 Cal.App.4th at p. 555.)

Mother's burden was to establish that her relationship with J.D. "promotes [J.D.'s] well-being . . . to such a degree as to outweigh the well-being [J.D.] would gain in a permanent home with new, adoptive parents." (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555, quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Mother points to her visits with J.D. that occurred early in the dependency, during which mother appropriately played, held and talked to J.D., and was attentive to her needs. Mother also points to the visit after her relapse on July 29, 2013, in which she cleaned J.D.'s room, gave her a bath, and clipped her nails. She claims there was no evidence her relationship with J.D. was harmful. But the record shows the contrary: that at the time of mother's relapse, she was not watching J.D. as she normally did, prompting her friend's mother to call M.S., who came to get J.D. After mother's relapse and J.D.'s return to M.S.'s care, J.D.'s visits were more like friendly visits. J.D. saw mother as a friend, instead seeking out M.S. for her needs; J.D. did not cry when visits ended, and she showed comfort when returned to M.S.'s care. M.S. had also reported in March 2014 that during visits, mother spent more time going through household items rather than spending time with J.D., leading M.S. to change the location of visits to a nearby mall. And as we have summarized above,

18

mother had moved outside San Diego County, and her visits were infrequent and sporadic in the months leading to the section 366.26 hearing.

Even deeming mother's infrequent visits with J.D. to be loving and pleasant, such visits, without a significant positive emotional attachment between parent and child, are not enough. (*In re Beatrice M.*, *supra*, 29 Cal.App.4th at pp. 1418-1419; see also *In re L.S., Jr.* (2014) 230 Cal.App.4th 1183, 1199; *In re I.R.* (2014) 226 Cal.App.4th 201, 213; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642-643.) And mother cites no specific evidence showing that the termination of her relationship with J.D. would be detrimental to J.D. or that their relationship conferred benefits to J.D. more significant than the permanency and stability offered by adoption. There is no bonding study or other evidence to show J.D. would experience detriment from permanent separation and termination of parental rights. (Compare, *In re Amber M.* (2002) 103 Cal.App.4th 681, 689-690 [mother presented evidence of a psychologist's bonding study, testimony of a court appointed special advocate, and statements from the child's therapist to show a beneficial relationship]; accord, *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 533-534; *In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.)

The record also supports an implied finding that the benefits and stability J.D. will receive by being placed with maternal grandmother M.S. outweighed any benefit inuring to J.D. through continuing her relationship with mother. (See *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 ["[T]he court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer."].) J.D. had been removed from her mother's care

19

when she was only eight months old and was thriving in her placement with M.S. and her husband, looking to M.S. for primary comfort and care and referring to M.S. as "mama" or "mommy." J.D. was observed to have a strong attachment to M.S. Even if we were to assume there was evidence that mother and J.D. had a parent-child relationship, the record does not establish further that J.D. would suffer *great* harm (*In re Autumn H.*, at p. 575; *In re Brittany C.* (1999) 76 Cal.App.4th 847, 853) by terminating mother's parental rights.

Ultimately Agency concluded that J.D. was doing well in M.S.'s home, and that M.S. was committed to adopting her and providing her a safe, and permanent home, and was meeting all of her emotional, developmental, and special medical needs. Social worker Soto believed J.D. needed the opportunity to grow up in a safe, nurturing and stable environment with parents who would put her needs and interests first. The juvenile court was entitled to credit Soto's assessments and conclusions. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

We simply cannot say on this record that by the time of the contested section 366.26 hearing, mother and J.D. had a "substantial, positive emotional attachment" (see *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re C.F.*, *supra*, 193 Cal.App.4th at p. 557) or the requisite parent-child bond. In view of this, and the evidence recited above, we find substantial evidence supports the juvenile court's finding the beneficial parent-child relationship exception was inapplicable in this case.

20

## DISPOSITION

The order is affirmed.

O'ROURKE, J.

WE CONCUR:

NARES, Acting P. J.

IRION, J.